UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

MANUEL J. ARROYO,

                     Plaintiff,

       v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                     Defendant.

-----------------------------------------------------------------x

**MEMORANDUM & ORDER**
14−CV−3513

PAMELA K. CHEN, United States District Judge:

      Plaintiff Manuel J. Arroyo ("Plaintiff") brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the Social Security Administration's ("SSA") denial of his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The parties have cross-moved for judgment on the pleadings. (Dkts. 12, 16.) Plaintiff seeks reversal of the Commissioner's decision and immediate award of benefits, or alternatively, remand for further administrative proceedings. The Commissioner seeks affirmation of the denial of Plaintiff's claims. For the reasons set forth below, the Court GRANTS Plaintiff's motion for judgment on the pleadings and DENIES the Commissioner's motion. The Court remands Plaintiff's claim to the Commissioner for further proceedings consistent with this opinion.

## BACKGROUND

### A.      Procedural History

      Plaintiff applied for DIB and SSI on May 23 and May 31, 2011, respectively. (Tr. 16.)[1]

Plaintiff claimed disability beginning on August 1, 2008 due to depression, anxiety, and a sleep

---

[1] "Tr." refers to the Administrative Transcript. (Dkt. 9.) Page references are to the continuous pagination of the Administrative Transcript supplied by the Commissioner.

disorder. (Tr. 30.) On October 14, 2011, the SSA denied Plaintiff's claims for both DIB and SSI. (Tr. 16.) Plaintiff requested a hearing before an administrative law judge ("ALJ") on November 17, 2011. (*Id.*) ALJ Michael Friedman held a hearing on November 8, 2012, where Plaintiff and his non-attorney representative testified. (Tr. 16, 101.) One week later, by decision dated November 16, 2012, the ALJ denied Plaintiff's DIB and SSI claims. (Tr. 16-23.) On February 27, 2014, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review. (Tr. 6-8.) On May 13, 2014, the Appeals Council extended Plaintiff's time to file an action by 30 days from the receipt of that letter. (Tr. 1.) Plaintiff timely filed this action on June 3, 2014. (Dkt. 1.)

###### B.     Non-Medical Evidence: Plaintiff's Self-Reporting and Testimony

*June 9, 2011 Disability Report.* Plaintiff was born on October 15, 1973 and was 34 years old on the onset date of his alleged disability. (Tr. 123.) Plaintiff reported that his highest level of education is one or two years of college. (Tr. 128, 264.) In the years leading up to his claimed disability onset date, Plaintiff held multiple full-time positions. From March to December 2000, Plaintiff worked as an office manager for a court reporting firm. (Tr. 129.) From February 2001 to February 2004, Plaintiff worked as an electrician's apprentice. (*Id.*) For an unspecified length of time in 2006, Plaintiff worked as an electrician. (*Id.*) And from August 2007 to August 2008, Plaintiff was employed as an electrical instructor at a private school. (*Id.*) Plaintiff stated that left his job at the school in August 2008 due to his depression and anxiety; he has not held another job since that date. (Tr. 128.)

*November 8, 2012 ALJ Hearing.* At his hearing before the ALJ, Plaintiff testified that he stopped working in 2008 because he went through some "bad family court stuff" and had a "little bit of a breakdown." (Tr. 30.) Plaintiff testified that he has continued to experience emotional difficulties because of a protracted custody battle over his younger daughter; in addition, he and

his current wife have also since separated because of fabricated allegations of sexual abuse by his stepson and how Plaintiff was handling his depression. (Tr. 31-33.) Since his separation with his wife, which—though unclear—appears to have occurred at some point after Plaintiff applied for Social Security benefits in May 2011 (*see* Tr. 32 (referencing events of the "last eight months," meaning earlier in 2012)), Plaintiff has lived by himself. (Tr. 30.)

Plaintiff stated that he has not been sleeping well and that he was "tired of everything"— he has "no motivation" and "no will" in light of his family court problems. (Tr. 39.) Plaintiff testified that he could not concentrate because he is always stuck in his own head. (Tr. 33.) With respect to his activities of daily living, Plaintiff testified that he cooks once a day but lives off of canned foods; he only does grocery shopping once a month because he gets panic attacks when around others; and he tries keeps his room relatively clean. (Tr. 37.)

***June 27, 2011 Function Report.*** In a function report dated June 27, 2011, Plaintiff stated that as a result of his depression and anxiety, he avoids contact with people, does not feel motivated to take care of himself, and has difficulty sleeping. (Tr. 38, 138.) Plaintiff stated that he also has trouble paying attention or remembering things; he "drifts off" and is not motivated to finish tasks that he has started. (Tr. 144.) Plaintiff reported experiencing frequent panic attacks, which are triggered by "memories of my children, no love from my family, [and] just being around people." (Tr. 145.) Plaintiff stated that although he used to be a good cook, he now largely prepares canned goods such as Chef Boyardee, tuna, rice, and hot dogs. (Tr. 139.) He shops for food "every couple [of] days" and "run[s] in and run[s] out" to avoid people. (Tr. 141.) He typically only leaves his apartment for food, because it is "very uncomfortable" to go out. (Tr. 140.) However, sometimes a friend will treat him to a meal. (Tr. 139, 142.) Plaintiff does his own laundry. (Tr. 140.) Plaintiff does not know if the medication or therapy is helping; he stated that he still feels anxious. (Tr.

146.)  Plaintiff also reported experiencing painful headaches that last for up to an hour approximately three times a week.  (Tr. 159.)  Plaintiff stated that when he has such headaches, he needs to insulate himself from all noise and light.  (Tr. 159.)

*Arbor WeCARE Biopsychosocial Summary.*[2]  On July 14, 2011, Plaintiff was evaluated by a medical professional and a case manager at WeCARE, a New York City Human Resources Administration public assistance program designed to help low-income clients with medical and/or mental-health issues find employment and/or apply for disability benefits.[3]  (Tr. 260–277.)  The case manager noted that Plaintiff reported being unable to take public transportation because of his anxiety.  (Tr. 262.)  She also indicated that his appetite was poor, and that he has trouble concentrating on activities such as reading the newspaper and watching television.  (Tr. 262.)  Plaintiff's PHQ-9 score was recorded as 19,[4] and his depression was rated severe.  (Tr. 263.)  However, the case manager noted that Plaintiff is able to wash dishes, clothes, make his bed, shop for groceries, cook meals, dress, bathe, and groom himself.  (Tr. 268.)  The assessment of Plaintiff by the WeCARE medical professional, Dr. Sundararaja Chandrasekaran, is summarized in the Medical Evidence section.  *See infra* at 6.

*November 19, 2011 Function Report.*  In a function report completed by an Arbor WeCARE case manager dated November 19, 2011, Plaintiff reported that when he does not have

---

[2] The ALJ refers to this report as the "FEGS" report.  (Tr. 22.)  FEGS was, along with Arbor, one of the outside contractors that operated the WeCARE program.  *See* New York City Office of the Comptroller, *Audit Report on the Oversight of the WeCARE Program Contractors by the Human Resources Administration* (June 30, 2008) at 4, http://comptroller.nyc.gov/wp-content/uploads/documents/MG08_083A.pdf.   However, it was Arbor, and not FEGS, that provided the WeCARE report here.

[3] Overview of WeCARE Program, FedCap, http://www.fedcap.org/content/wecare (last visited Jan. 4, 2016).

[4] The PHQ-9, or "Patient Health Questionnaire," is a "self-administered . . . depression module," which serves as a measure of "depression severity." Kurt Kroenke *et al., The PHQ–9: Validity of a Brief Depression Severity Measure*, 16 J. Gen. Internal Med. 606 (2001).

medical appointments, he stays in the apartment—sometimes staying in bed for the whole day. (Tr. 304.) Plaintiff does not want interaction with other people because it triggers anxiety attacks and mood swings; when in a big crowd, Plaintiff "starts blushing, sweating, and trembling due to social anxiety." (Tr. 309, 311.) Plaintiff reported difficulty traveling on public transportation, especially during rush hours. (Tr. 304.) He eats once a day and prepares food on his own, typically sandwiches and canned food. (Tr. 306.) He buys food at his local supermarket but tries to go when there are fewer crowds. (Tr. 307.) Plaintiff does light cleaning, washes dishes, makes the bed, tries to keep his room clean, and does laundry once every two weeks. (Tr. 306.) However, he reported sometimes not showering for days because he is too depressed. (Tr. 305.)

The case manager noted based on her own observation that Plaintiff was able to follow spoken and written instructions. (Tr. 309.) He can pay attention for 40 minutes. (*Id.*) However, the case manager noted in a check-the-box section that Plaintiff had some problems with memory and concentration, completing tasks, and getting along with others. (Tr. 309.) Plaintiff is able to pay bills and count change, though feels his money management skills have deteriorated since becoming depressed; he cannot use a checkbook or handle banking accounts. (Tr. 307-08.) When under stress, Plaintiff reported that he "goes crazy mentally" and needs to take medications. (Tr. 310.) He also states that he does not like changes in daily routine, which confuse and scare him. (*Id.*) Plaintiff thinks that other people are against him, say bad things about him, and he does not trust anybody. (Tr. 311.) However, the case manager did not think Plaintiff's ability to get along with authority figures was affected. (Tr. 310.)

C.      **Medical Evidence**

1.      **New York Psychiatric Services, P.C.**

Since 2009, Plaintiff has primarily sought treatment from New York Psychiatric Services,

P.C., where he saw Dr. Iskander Enikeev, Dr. Evgeny Fink, and Mr. Boris Shapiro.  Plaintiff's

medical history prior to 2009 is not part of the administrative transcript.  Plaintiff reports trying to

kill himself in his young adult years by overdosing on pills, and also being hospitalized once for

"depressed mood" in the early 2000s.[5]  (Tr. 217, 262, 311.)  Plaintiff has seen mental health

professionals on and off ever since that hospitalization.  (Tr. 217.)  Plaintiff consistently takes

Wellbutrin, Ambien, Pristiq, and Remeron.  (*See, e.g.*, Tr. 131, 146, 177, 217.)

***Dr. Iskander Enikeev.***  Plaintiff first started seeing his regular psychiatrist, Dr. Iskander

Enikeev, on February 24, 2009.  (Tr. 182-86.)  On that date, Dr. Enikeev diagnosed Plaintiff with

generalized anxiety disorder.  (Tr. 186.)  Although Dr. Enikeev's records from this date are largely

illegible, Plaintiff appears to have been prescribed a number of medications and was advised to

undergo therapy.  (Tr. 186.)  Dr. Enikeev conducted a mental status examination of Plaintiff.  (Tr.

184-86.)  Plaintiff's speech, thought process, perception, memory, attention, and concentration all

fell within normal limits.  (*Id.*)  Dr. Enikeev noted that Plaintiff was friendly, casually dressed, and

that his judgment was intact in an ordinary social situation.  (*Id.*)  However, Dr. Enikeev noted that

Plaintiff had a "restricted" affect and "anxious" mood.  (Tr. 184.)

Plaintiff continued to see Dr. Enikeev on a near-monthly basis thereafter.  (Tr. 187-210

(records from April 2009 through June 2011).)  Most of the writing in these records is illegible.

However, in each of these records, Dr. Enikeev consistently checked off the following boxes,

---

[5] The record contains two references to Plaintiff overdosing on pills in his teenage and/or young adult years, (*see* Tr. 262, 311), and it is unclear from the record whether these refer to the same incident or two separate incidents.

indicating some impairment: "anxious" mood, "constricted" affect, "slowed" cognition, "fair" insight, "fair" judgment, and psychomotor retardation. Some of the records additionally indicated reduced concentration and attention. (*See, e.g.*, Tr. 195, 196.) In the majority of the records, Dr. Enikeev describes Plaintiff's condition as "normal" or "fair." (*See, e.g.*, Tr. 184-215.)

In a psychiatric report for WeCARE dated November 12 and 15, 2011 in connection with Plaintiff's DIB and SSI claims ("November 2011 Report"), Dr. Enikeev indicated that Plaintiff experienced a "moderate" degree of impairment with respect to activities of daily living and social functioning, due to his anxiety and low stress tolerance. (Tr. 247.) Using check-boxes, Dr. Enikeev indicated that Plaintiff's restrictions in his activities of daily living included marked difficulties in planning daily activities, using public transportation, and shopping. (Tr. 249.) In addition, Dr. Enikeev checked off that Plaintiff was markedly limited in the ability to hold a job, cooperate with others, get along with family, friends, and neighbors, communicate clearly with others, cooperate with coworkers, respond to supervisors and those in authority, respond without fear to strangers, and interact and actively participate in group activities. (Tr. 249-250.) In response to a question about Plaintiff's "ability to make occupational adjustments," including the ability to follow instructions, respond appropriately to supervisors and coworkers, and handle work pressures, Dr. Enikeev wrote that Plaintiff's "ability to perform job-related activities is affected by the process of his emotional disorder." (Tr. 248.)

Dr. Enikeev further indicated in the November 2011 Report that Plaintiff had "problems completing tasks once started due to impaired concentration." (*Id.*) He also opined that Plaintiff had limited ability to assume the increased mental demands associated with competitive work due to his low stress tolerance and impaired concentration. (Tr. 250.) Dr. Enikeev denied that Plaintiff had ever had any episodes of decompensation in a work or work-like setting, or that he had ever

lived in a supportive living situation. (Tr. 248.) Dr. Enikeev noted that Plaintiff's depressive order was characterized by anhedonia (loss of interest), sleep disturbance, decreased energy, and difficulty concentrating and thinking. His anxiety order was characterized by motor tension, autonomic hyperactivity, apprehensive expectation, recurrent severe panic attacks, and recurrent and intrusive recollections of a traumatic experience. (Tr. 253, 255, and 257.) Dr. Enikeev observed no memory impairment, perceptual or thinking disturbances, change in personality, or loss of intellectual ability. (Tr. 253.)

One year later, in a November 2, 2012 letter, Dr. Enikeev stated that Plaintiff "suffers from chronic major depressive disorder, dysthymia,[6] and generalized anxiety disorder" and that "despite regular . . . treatment since [March 24, 2009], he remains chronically depressed." (Tr. 330.) He further stated that "[p]atient is unable to work and to be involved in job-related activities." (*Id.*)

***Dr. Evgeny Fink.*** On March 8, 2011, a different psychiatrist at the same clinic as Dr. Enikeev, Dr. Evgeny Fink, examined Plaintiff. (Tr. 207.) Dr. Fink noted that Plaintiff's condition "has been stable" and that his mood was "ok," but that Plaintiff expressed worry because of ongoing family court proceedings involving his daughter. (*Id.*) Like Dr. Enikeev's assessments of Plaintiff's mental status, Dr. Fink indicated that Plaintiff had an "anxious" mood, a "constricted" affect, and "fair" insight and judgment. (*Id.*) Unlike Dr. Enikeev, however, Dr. Fink did not note any psychomotor retardation, checking off "normal" for that category; in addition, he rated Plaintiff's cognition as "intact" as opposed to "slowed." (*Id.*) Dr. Fink also noted Plaintiff had dysthymia and generalized anxiety disorder. (*Id.*)

---

[6] Dysthymia is a "continuous long-term (chronic) form of depression." Overview of Dysthymia, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/persistent-depressive-disorder/home/ovc-20166590 (last visited Jan. 4, 2016).

*Mr. Boris Shapiro.*  In addition to his near-monthly visits to Dr. Enikeev, Plaintiff also started seeing Boris Shapiro, a licensed clinical social worker, in 2011 for weekly therapy sessions. (Tr. 211-216 (records from April 2011 through June 2011).)  In the initial diagnostic evaluation on April 30, 2011, Mr. Shapiro noted that Plaintiff presented with "depressed and anxious mood," and reported having low stress tolerance and panic attacks.  (Tr. 211.)  Mr. Shapiro also noted that Plaintiff "feels his family issues and [unemployment] have triggered depression and contributed to overall stress."  (*Id.*)  Mr. Shapiro noted that Plaintiff's "emotional state has been affecting his functioning" and that Plaintiff feels "his social activities are 'down.'"  (*Id.*)  He gave Plaintiff a Global Assessment of Functioning ("GAF") score of 60, which indicates "moderate" symptoms or difficulty in functioning.[7]  (Tr. 212.)  On May 21, 2011, Mr. Shapiro wrote a letter to an unknown recipient stating that Plaintiff presented with "depressed mood" and a "high level of anxiety" and that his conditions interfered with his concentration, his ability to tolerate stress associated with daily activities, and his ability to accomplish tasks once started.  (Tr. 314.)

In an undated report from 2011 to the New York State Office of Temporary and Disability Assistance (Tr. 175-181), Mr. Shapiro opined that Plaintiff's ability to do work is "affected by the process of the disorder," although he did not elaborate beyond brief comments that Plaintiff's attention and concentration, daily function, and social interaction were all "impaired by the process of the disorder."  However, he noted that Plaintiff's understanding and memory were not limited

---

[7] Until 2013, the GAF was a scale promulgated by the American Psychiatric Association to assist "in tracking the clinical progress of individuals [with psychological problems] in global terms."  *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (citing Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000)); *but see* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013) (discussing reasons for recommending that GAF scale be dropped).  A GAF between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *Kohler*, 546 at 262 n.1.

in any way. Mr. Shapiro also noted that Plaintiff reports "having problems concentrating and following instructions," including "past problems following instructions at work," as well as being easily frustrated and irritable. (Tr. 179-80.) Mr. Shapiro noted that Plaintiff presents as "fairly engaged, well-related" and that his speech, thought, and perception were "within normal limits." (Tr. 178.) Although noting that Plaintiff's mood was anxious and his affect mood-congruent, Mr. Shapiro indicated that Plaintiff was "appropriate otherwise." (*Id.*)

### 2. Non-Treating Physicians

*Dr. Michael Alexander.* On July 20, 2011, Dr. Michael Alexander, a psychologist, performed a consultative psychiatric evaluation. (Tr. 217.) Dr. Alexander concluded that Plaintiff's problems were "not significant enough to interfere with [his] ability to function on a daily basis." (*Id.*) He stated that Plaintiff was able to dress, bathe, and groom himself, cook, clean, shop, manage his own funds, take public transportation independently, watch television, and read. (*Id.*) Dr. Alexander also concluded that Plaintiff could follow simple directions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform more complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress. (Tr. 219.) Dr. Alexander rated Plaintiff "normal" in all categories of the mental status examination. (*Id.*) In addition, Dr. Alexander found that Plaintiff had coherent and goal-directed thought processes, full-range affect, neutral mood, intact attention and concentration, intact memory skills, average cognitive functioning, and good insight and judgment. (*Id.*) Dr. Alexander found "no evidence of panic or manic related symptoms, thought disorder, or cognitive deficit." (*Id.*) Plaintiff "presented as a cooperative, friendly, and alert male," who appeared well-groomed and had appropriate eye contact. (*Id.*)

*Arbor WeCARE Reports.* In the July 14, 2011 WeCare report, Dr. Chandrasekaran determined Plaintiff to be "temporarily unemployable," noting that he has "severe anxiety [and] depression with poor sleep, difficulty concentrating[,] lack of interest in spite of multiple medications [and] is not stable to work for now." (Tr. 276.) The report stated that Dr. Chandrasekaran reached this conclusion by examining the case manager's assessment, clinical documentation provided by the individual, and his own medical examination of the individual. In an undated "Treating Physician's Wellness Plan Report," another WeCARE medical professional, Dr. Vsevolod Rudoy, stated that Plaintiff has "low stress tolerance and impaired emotions control, impaired concentration, and irritability." (Tr. 298.) He concluded that Plaintiff was unable to work for at least 12 months, noting that Plaintiff's ability to complete tasks once started was limited. (*Id.*) Dr. Rudoy further opined that Plaintiff's "present condition and his emotional state may affect his ability to perform job-related activities and maintain proper focus on assigned task[s]." (*Id.*) It is unclear whether Dr. Rudoy personally examined Plaintiff.

*Dr. Rahel Eyassu.* On October 6, 2011, Dr. Rahel Eyassu, an internal medicine physician, performed a consultative physical exam regarding Plaintiff's migraine headaches. (Tr. 221.) Dr. Eyassu noted that Plaintiff cooked and shopped biweekly, cleaned and laundered weekly, and showered and dressed himself. (Tr. 222.) His physical exam was normal.

*Dr. Wlodek Skranovski.* On October 14, 2011, Dr. Wlodek Skranovski, a State agency psychiatric consultant, completed a Psychiatric Technique Review Form ("PTRF") for Plaintiff. (Tr. 225-37.) Dr. Skranovski does not appear to have examined Plaintiff, relying instead on documents in the record. (Tr. 237.) Dr. Skranovski concluded based on a review of the records that Plaintiff's disorders were non-severe and would not result in any limitation in his activities of daily living, social functioning, and concentration, or cause extended episodes of decompensation.

(Tr. 235.)  He also concluded that Plaintiff was able to memorize and carry out tasks, interact socially in a work setting, and adapt to changes.  (Tr. 237.)

## DISCUSSION

### A.    Standard of Review

Unsuccessful claimants for disability benefits under the Social Security Act (the "Act") may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow."  42 U.S.C. §§ 405(g), 1383(c)(3). In reviewing a final decision of the Commissioner, the Court's duty is "is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (alterations and internal quotation marks omitted)).  In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal citation omitted).  However, "it is up to the agency, and not this court, to weigh the conflicting evidence in the record."  *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998).  Under any circumstances, if there is substantial evidence in the record to support the Commissioner's findings as to any fact, they are conclusive and must be upheld.  42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013).

### B.    Eligibility Standard for Social Security Disability Benefits

To receive DIB or SSI, claimants must be disabled within the meaning of the Act.  The definition of "disabled" is the same for the purposes of receiving DIB and SSI benefits.  Claimants establish disability status by demonstrating an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3).  The claimant bears the initial burden of proof on disability status and must demonstrate disability status by presenting medical signs and findings, established by "medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require.  42 U.S.C. §§ 423(d)(5)(A), 1382c(a)(3)(D); *but see Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir. 1999) ("[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel or by a paralegal.") (internal alterations and quotation marks omitted).

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Act as set forth in 20 C.F.R. §§ 404.1520(a)(1), 416.920.  If at any step the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends there.  First, the ALJ determines whether the claimant is currently engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If so, the claimant is not disabled.  If not, the ALJ proceeds to the second step to determine whether the claimant suffers from a "severe impairment."  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  An impairment is "severe" if it "significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(a)(c), 416.920(a)(c).  If the impairment is not severe, the claimant is not disabled.  If it is, the ALJ proceeds to the third step, which considers whether the impairment meets or equals one of the impairments listed in the Act's regulations ("Listings").  20 CFR §§ 404.1520(a)(4)(iii),

416.920(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1. In the context of mental impairments, this step requires an ALJ to include a specific finding with respect to the claimant's degree of limitation in each of four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3), 404.1520a(e)(4), 416.920a(c)(3), 416.920a(e)(4).

If the ALJ determines at step three that the claimant has a listed impairment, the ALJ will find the claimant disabled. If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's "residual functional capacity" ("RFC") before moving onto steps four and five. A claimant's RFC is an assessment of "the most [the claimant] can still do despite [his or her physical or mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). At the fourth step, the ALJ considers whether, in light of the claimant's RFC, he or she is able to perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If so, the claimant is not disabled. If not, the ALJ proceeds to the fifth step, where the burden shifts to the ALJ to demonstrate that the claimant has the capacity to perform other substantial gainful work which exists in the national economy, considering the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If so, the claimant is not disabled. If not, the claimant is disabled and entitled to benefits. *Id.*

### C.     The ALJ's Decision

On November 16, 2012, the ALJ issued a decision denying Plaintiff's claims. (Tr. 13-26.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of August 1, 2008. (Tr. 18.) At step two, the ALJ found that Plaintiff had the severe impairments of anxiety-related disorder and depression. (*Id.*) At step three, the ALJ found that these impairments did not meet or equal the listed impairments under Listings 12.04 (Affective Disorders) or 12.06 (Anxiety Related Disorders). (Tr. 19.) In reaching this conclusion, the ALJ

14

found that Plaintiff did not have "marked" limitations in at least two of the following areas: (1) activities of daily living, (2) maintaining social function, (3) maintaining concentration, persistence or pace, or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1. §§ 12.06(B), 12.04(B). Rather, the ALJ concluded that Plaintiff had only a "mild" restriction in activities of daily living and "moderate" difficulties with social functioning, concentration, persistence, or pace. (Tr. 19.) The ALJ also found no evidence of any episodes of decompensation. (Tr. 20.)

The ALJ next concluded that Plaintiff possessed the RFC to perform simple unskilled one/two-step jobs requiring only occasional interaction with others. (Tr. 20.) In making this RFC determination, the ALJ primarily relied on Dr. Enikeev's initial February 2009 evaluation and Dr. Alexander's July 2011 consultative assessment. (Tr. 21-22.) The ALJ disregarded the July 2011 WeCARE report and a November 2012 letter from Dr. Enikeev opining that Plaintiff was unable to work due to his disability, because they contradicted Dr. Enikeev's previous records and Dr. Alexander's consultative assessment. (Tr. 22.) The ALJ also disregarded as not credible Plaintiff's own statements concerning the intensity, persistence, and limiting effects of his symptoms "to the extent they are inconsistent with [Plaintiff's RFC]." (Tr. 21.)

The ALJ concluded at step four that in light of this RFC, Plaintiff was unable to perform any of his past relevant work, which were all either skilled or semi-skilled jobs such as electrician, teacher, and office manager. (Tr. 22.) At step five, however, the ALJ concluded that there were unskilled jobs that existed in significant numbers in the national economy that Plaintiff could perform. (Tr. 23.) In making this determination, the ALJ relied solely on the Medical-Vocational Guidelines and did not retain a vocational expert. (*Id.*) The ALJ concluded at the end of the five-step inquiry that Plaintiff was not disabled and denied his claims for benefits. (*Id.*)

### D. Analysis

Plaintiff does not dispute the ALJ's analysis and findings at steps one through three of the five-step inquiry.[8] Rather, Plaintiff argues that the ALJ's determination of his RFC was erroneous, because he failed to apply the treating physician rule and improperly assessed the credibility of Plaintiff's testimony about the intensity, persistence, and limiting effects of his symptoms. (Dkt. 13 ("Pl. Br.") at ECF 10-11.)[9] Plaintiff further argues that at step five, the ALJ improperly relied on the Medical-Vocational Guidelines instead of retaining a vocational expert. (Pl. Br. at ECF 14-15.) The Commissioner argues that the correct legal standards were applied and that the SSA's decision must be affirmed. (Dkt. 17 ("Def. Br.") at ECF 3.)

For the reasons set forth below, the Court finds that the ALJ failed to adequately explain his RFC determination. Accordingly, the Court remands this case for explanation and reevaluation of Plaintiff's RFC consistent with this opinion, including further development of the record as necessary under the treating physician rule. Following a reevaluation of Plaintiff's RFC, the ALJ shall determine whether a vocational expert is necessary at step five and explain that determination.

---

[8] This Court independently finds that the ALJ's determinations at all three steps are supported by substantial evidence. In particular, the Court finds that though his findings could have been better explained and supported, the ALJ applied the correct legal standard at step three. The ALJ set forth specific findings regarding Plaintiff's degree of limitation in the four functional areas, and his conclusion that Plaintiff has "moderate" difficulties in maintaining social functioning and concentration, persistence or pace is based on Dr. Enikeev's assessments of the same. (*See, e.g.*, Tr. 19 ("Later reports describe the claimant as being anxious and having a constricted affect, however, Dr. Enikeev noted that [Plaintiff] had a moderate impairment of social functioning"); *id.* ("[C]redible evidence of record [supports] the presence of a moderate impairment [in Plaintiff's ability to maintain concentration, persistence, or pace].").) As Dr. Enikeev himself rated Plaintiff's impairments in social functioning and concentration, persistence, or pace as "moderate" in his November 2011 Report, (*see* Tr. 247), the Court finds that the ALJ's findings at step three were supported by substantial evidence.

[9] "ECF" refers to the page numbering of the Court's electronic filing system, and not the document's internal pagination.

### 1.    The ALJ Failed To Adequately Explain His RFC Determination

In determining a plaintiff's RFC, the ALJ is required to provide "a narrative discussion describing how the evidence supports each [of his] conclusion[s]" and to "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, at *7 (July 2, 1996).  When assessing a plaintiff's RFC in the mental impairment context, the ALJ should consider limitations affecting a claimant's "ability to understand, to carry out and remember instructions, and to respond appropriately to supervision, coworkers, and work pressures in a work setting."  20 C.F.R. §§ 404.1513(c)(2), 416.913(c)(2); *see also* 20 C.F.R. §§ 404.1545(c), 416.945(c).  The ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a claimant's subjective symptoms.  *See generally* 20 C.F.R. §§ 404.1545, 416.945; *Alston v. Colvin*, No. 14-cv-0244, 2015 WL 5178158, at *14 (E.D.N.Y. Sept. 3, 2015).

### a)    The ALJ Failed to Expressly Consider Relevant Medical Opinions and Reconcile Inconsistent Medical Opinions

Here, the ALJ determined that Plaintiff had the RFC to perform unskilled one-to-two step jobs requiring only occasional interactions with others.  The ALJ expressly relied on two medical reports to determine Plaintiff's RFC: (1) Dr. Enikeev's initial 2009 evaluation of Plaintiff finding that Plaintiff's perception, memory, attention, concentration, judgment, and insight were all within normal limits; and (2) Dr. Alexander's consultative opinion concluding that Plaintiff "can follow and understand simple directions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform more complex tasks independently, make appropriate decisions, relate adequately with others, and can appropriately deal with stress."  (Tr. 21-22.)  The ALJ expressly discounted Dr. Enikeev's November 2012 letter (which opined that Plaintiff "is unable to work and to be involved in job-related activities"), as

well as Dr. Chandrasekaran's July 2011 WeCARE assessment (which concluded that Plaintiff was "temporarily unemployable"). (Tr. 22.) Aside from the foregoing, the ALJ did not reference any other medical record when assessing Plaintiff's RFC, though noted generally that later records from Dr. Enikeev did not document any severe deterioration in Plaintiff's ability to function or interact with others following his initial evaluation of Plaintiff. (Tr. 21.) In other parts of the decision, the ALJ credited Dr. Enikeev's assessments of Plaintiff's limitations in social functioning and maintaining concentration, persistence, or pace as "moderate."[10]

The Court finds that the ALJ erred when he failed to explain how he resolved the inconsistency between Dr. Enikeev's November 2011 Report and Dr. Alexander's opinions. In that report, Dr. Enikeev indicated that Plaintiff was markedly limited in the ability to hold a job, cooperate with others, cooperate with coworkers, and respond to supervisors and those in authority, among other limitations. (Tr. 249-250.) Dr. Enikeev further indicated that Plaintiff had problems completing tasks once started and assuming increased mental demands associated with competitive work due to low stress tolerance and impaired concentration. (Tr. 250.) These opinions bear directly on Plaintiff's ability to work and directly contradict Dr. Alexander's opinions. Yet, the ALJ does not even mention the November 2011 Report, let alone attempt to resolve the inconsistency between that report and Dr. Alexander's opinions, as required by the regulations. Because the Court cannot ascertain how much weight, if any, the ALJ accorded Dr. Enikeev's November 2011 opinions in determining Plaintiff's RFC, remand is appropriate.

The ALJ's failure to specifically address Dr. Enikeev's November 2011 Report is particularly glaring for two reasons. First, the November 2011 Report was one of very few medical

---

[10] The Court notes that the ALJ's statement that he "cannot give significant weight" to Dr. Enikeev's opinions referred—not, as Plaintiff appears to argue, to Dr. Enikeev's opinions as a whole (see Pl. Br. at ECF 7)—but specifically to his November 2012 letter.

opinions in the record on Plaintiff's work-related mental limitations, *i.e.*, opining directly on Plaintiff's ability to understand, to carry out and remember instructions, and to respond appropriately to supervision, coworkers, and work pressures in a work setting. The 2009 records of Dr. Enikeev on which the ALJ *did* rely, by contrast, did not include Dr. Enikeev's opinions on what Plaintiff remained *capable* of doing, but noted simply that he had impairments in certain areas, including "slowed" cognition and "reduced" concentration. The ALJ thus erred in relying so heavily on Dr. Enikeev's 2009 evaluations as a basis for his RFC determination, particularly where Dr. Enikeev later *did* provide an assessment of Plaintiff's functional limitations.[11] Second, Dr. Enikeev is a treating physician, such that if an ALJ does not give his opinion controlling weight, the ALJ must explain how much weight he *did* accord to Dr. Enikeev's opinions and why. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician, as here, is itself a ground for remand. *See Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir. 1998).

The Court notes further that if the ALJ finds on remand that Dr. Enikeev's November 2011 Report lacks medical support or is inconsistent with Dr. Enikeev's own previous records, the ALJ has an obligation to contact Dr. Enikeev for additional information before discounting his opinions. *See Rosa*, 168 F.3d at 79 ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to

---

[11] *Cf. Tankisi v. Comm'r of Soc. Sec.*, 521 Fed. App'x 29, 33 (2d Cir. 2013) (absence of a formal medical opinion on claimant's RFC from treating physician does not necessarily require remand where the record included an assessment of claimant's limitations from a treating physician and the record was so voluminous so as to permit the ALJ to make an informed finding on claimant's RFC); (summary order); *Swiantek v. Comm'r of Soc. Sec.*, 588 Fed. App'x 82, 84 (2d Cir. 2015) (summary order) (similar). Here, however, the treating physician did provide an assessment of Plaintiff's limitations, and the ALJ was required to address and/or develop it.

develop the administrative record accordingly."); *Correale-Englehart v. Astrue,* 687 F. Supp. 2d 396, 428 (S.D.N.Y. 2010) ("[I]f a physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician, as needed, to fill any clear gaps before rejecting the doctor's opinion."); *Feliciano v. Astrue*, No. 05-cv-04066, 2008 WL 3887602, at *8 (E.D.N.Y. Aug. 20, 2008) (similar) (citing *Schaal*, 134 F.3d at 505).

Next, although not an issue raised by Plaintiff, the Court finds that the ALJ further erred by failing to address the opinions of Mr. Shapiro, the licensed social worker who saw Plaintiff weekly between April and June 2011; indeed, the Court is unable to discern from the ALJ's decision whether he considered those opinions at all. *See Canales v. Commissioner of Social Security*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010) ("While the ALJ was free to conclude that the opinion of a licensed social worker was not entitled to any weight, the ALJ had to explain that decision.") (citing SSR 06–03p, Titles II and XVI; *Considering Opinions and Other Evidence From Sources Who are Not "Acceptable Medical Sources" in Disability Claims*, 2006 WL 2329939, at *3 (Aug. 9, 2006)).  Notably, here, Mr. Shapiro is one of only two treaters who saw Plaintiff regularly, and he opines—admittedly vaguely—that Plaintiff's conditions interfered with his concentration, his ability to tolerate stress associated with daily activities, and his ability to accomplish tasks once started.  (Tr. 314.)  Though it may well be that the ALJ determines that Mr. Shapiro's opinions are not entitled to significant weight on remand, the ALJ should expressly address them and explain what weight he is according them and why.

On remand, the ALJ should address Dr. Enikeev's November 2011 Report and Mr. Shapiro's opinions and explain how he has taken them into account (or explain why he has not) in

determining Plaintiff's RFC.[12]   In particular, the ALJ should explain how he resolves the inconsistency between Dr. Enikeev's November 2011 Report and Dr. Alexander's consultative examination, as well as contact Dr. Enikeev for additional information if the ALJ determines Dr. Enikeev's November 2011 Report lacks support or is inconsistent with his previous records.  The ALJ shall reevaluate Plaintiff's RFC following proper consideration of Dr. Enikeev and Mr. Shapiro's opinions, including any additional evidence obtained.

### b)      The ALJ Improperly Assessed Plaintiff's Credibility

Plaintiff next argues that the ALJ improperly assessed Plaintiff's credibility as to his symptoms and limitations in determining Plaintiff's RFC.  "[W]hile an ALJ 'is required to take the claimant's reports of pain and other limitations into account,' he or she is 'not require[d] to accept the claimant's subjective complaints without question."  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  Rather, the ALJ, "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility . . . may decide to discredit the claimant's subjective estimation of the degree of impairment."  *Tejada v. Apfel*, 167 F.3d 770, 776 (2d Cir. 1999) (internal citation omitted).  "It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."  *Carroll v. Sec'y of Health & Human Servs.,* 705 F.2d 638, 642 (2d Cir. 1983).  Thus, where an ALJ gives specific reasons for finding the claimant not credible, the ALJ's credibility determination "is generally entitled to deference on appeal."  *Selian,* 708 F.3d at 420 (citation

---

[12] However, the Court finds that the ALJ properly disregarded Dr. Enikeev's November 2012 letter and the WeCARE July 2011 report opining that Plaintiff was unable to work, to the extent those opinions could be interpreted as deciding whether Plaintiff is able to work at *any* job. These are conclusory opinions that do not relate to the "nature and severity" of Plaintiff's impairments but rather, constitute disability determinations, which fall in the exclusive domain of the Commissioner.  20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that a claimant is disabled cannot itself be determinative.").

omitted). "If the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." *Aponte v. Sec'y, Dep't of Health & Human Servs.,* 728 F.2d 588, 591 (2d Cir. 1984) (internal citations omitted).

The regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. First, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. §§ 404.1529(a), 416.929(a). If the claimant does suffer from such an impairment, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. *Id.*

Purporting to apply this framework, the ALJ found first that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. 21.) However, he concluded at the second step that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [his alleged] symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment." (Tr. 21.)

As an initial matter, this Court notes that this boilerplate language has been rejected by numerous courts in this Circuit because it "implies that ability to work is determined first and is then used to determine the claimant's credibility." *Perrin v. Astrue*, No. 11-cv-5110, 2012 WL 4793543, at *5 (E.D.N.Y. Oct. 9, 2012) (citing *Bjornson v. Astrue,* 671 F.3d 640, 645 (7th Cir. 2012)); *Otero v. Colvin,* No. 12-CV-4757, 2013 WL 1148769, at *7 (E.D.N.Y. Mar. 19, 2013) ("The assessment of a claimant's ability to work will often depend on the credibility of her statements concerning the intensity, persistence and limiting effects of her symptoms. Thus, it makes little sense to decide on a claimant's RFC prior to assessing her credibility."); *Smollins v. Astrue,* No. 11-cv-424, 2011 WL 3857123, at *10–11 (E.D.N.Y. Sept. 1, 2011) (criticizing such

language as "flawed not only in its brevity, but also in its acceptance as a foregone conclusion of [claimant's] capacity"). The Court thus finds that the ALJ erred to the extent that he reached a conclusion on Plaintiff's RFC prior to assessing Plaintiff's credibility.[13]

Given the Court's instruction to the ALJ to address specific medical opinions and reevaluate Plaintiff's RFC on remand, the Court cannot at this time determine whether the ALJ's credibility determination is supported by substantial evidence. *See Rosa,* 168 F.3d at 82 n.7 ("Because we have concluded that the ALJ was incorrect in [his] assessment of the medical evidence, we cannot accept [his] conclusion regarding [plaintiff's] credibility."). On remand, the ALJ should reassess Plaintiff's credibility after addressing Dr. Enikeev and Mr. Shapiro's opinions and developing the record as necessary. As noted above, the ALJ should make clear he is assessing Plaintiff's credibility *prior to* reaching a conclusion on Plaintiff's RFC. The ALJ should also specify *which* aspects of Plaintiff's testimony he is disregarding for lack of credibility and his reasons for doing so, instead of relying on a blanket statement discrediting all reported symptoms or limitations "to the extent" they are inconsistent with Plaintiff's RFC.

### 2. The ALJ Erred by Failing to Consult a Medical Vocational Expert

Finally, Plaintiff argues that the ALJ erred by resorting to the Medical-Vocational Guidelines instead of consulting a vocational expert to determine whether there was work existing in the national economy that Plaintiff could perform. The Second Circuit has held that an ALJ may not rely solely on the Guidelines where a claimant's non-exertional impairments (*i.e.,*

---

[13] It is possible that the ALJ meant simply that he was disregarding Plaintiff's testimony to the extent it was inconsistent with the objective medical evidence, rather than the RFC. Regardless, the ALJ should avoid relying on this type of boilerplate language and instead set forth the specific portions of Plaintiff's testimony that he is disregarding for lack of credibility and why.

impairments not related to strength)[14] "significantly limit the range of work permitted by his exertional limitations." *Zabala v. Astrue*, 595 F.3d 402, 410-11 (2d Cir. 2010) (citing *Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986)). In such cases, Plaintiff must consult a vocational expert. *Id.* Limitations are considered significant where they affect the ability to perform "basic mental demands of unskilled work, such as following simple instructions, and responding appropriately to supervisors and coworkers in usual work situations." *Selian*, 708 F.3d at 422 (citing *Zabala*, 595 F.3d at 411 (noting claimant's ability to "deal[] with work changes" as another consideration)). Because the Court has asked the ALJ to reevaluate Plaintiff's RFC on remand, a finding as to whether consultation with a vocational expert is required is premature at this stage. *See Romanelli v. Astrue*, No. 11-cv-04908, 2013 WL 1232341, at *12 (E.D.N.Y. Mar. 26, 2013).

Accordingly, on remand, the ALJ should, after reevaluating Plaintiff's RFC, determine whether Plaintiff's ability to work is significantly diminished by his anxiety and depression, *i.e.*, whether he has problems following simple instructions, responding to authority, cooperating with coworkers, or dealing with work changes. If so, the ALJ must consult a vocational expert to determine whether there is work in the national economy that Plaintiff could perform. If the ALJ finds that Plaintiff's non-exertional impairments are *not* significant enough to warrant vocational testimony, he must explain how he arrived at that determination. *See Hernandez v. Colvin*, No. 13-cv-03035, 2014 WL 3883415, at *14-15 (S.D.N.Y. Aug. 7, 2014) (collecting cases). It does not suffice to state in conclusory fashion, as the ALJ currently does, that Plaintiff's impairments have "little or no effect on the occupational base of unskilled work." *Id.* at *14.

---

[14] A nonexertional limitation is "one imposed by the claimant's impairments that affect her ability to meet the requirements of jobs other than strength demands, and includes manipulative impairments and pain." *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997) (citing 20 C.F.R. § 404.1569a (a), (c)).

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is GRANTED, and the Commissioner's motion is DENIED. Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), the Court reverses the decision of the Commissioner and remands this case for further proceedings consistent with this opinion.

Specifically, on remand, the ALJ is to: (i) address the opinions of Plaintiff's treating physician, Dr. Enikeev, contained in his November 2011 Report, which includes contacting Dr. Enikeev for further clarification and/or support for his conclusions if the ALJ finds the November 2011 Report to lack support or to be inconsistent with Dr. Enikeev's previous records; (ii) address Mr. Shapiro's records and opinions, and explain the weight the ALJ is according to them; (iii) reassess Plaintiff's credibility following a full consideration of Dr. Enikeev's and Dr. Shapiro's opinions; (iv) reevaluate Plaintiff's RFC in light of the foregoing; and (v) determine whether Plaintiff's non-exertional limitations significantly diminish Plaintiff's ability to work and if so, obtain the opinion of a vocational expert.

The Clerk of Court is respectfully requested to enter judgment accordingly.


SO ORDERED.


*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge


Dated: January 4, 2016
      Brooklyn, New York